Sebastian A. ANZALDO, guardian for Gia Anzaldo, a minor, Plaintiff-Appellee,

v.

S. W. CROES, d/b/a Modern City Motel, Defendant-Appellant.

No. 72-1448.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1973.

Decided May 1, 1973.

Gene R. Bushnell, Rapid City, S. D., for defendant-appellant.

Curtis D. Ireland, Rapid City, S. D., for plaintiff-appellee.

Before HEANEY and ROSS, Circuit Judges, and BENSON,* District Judge.

BENSON, District Judge.

This is a diversity negligence action in which the jury returned a $55,000.00 verdict for Gia Anzaldo, a minor. Appellant Croes appeals from the judgment and the order which denied his motion for judgment notwithstanding the verdict, or in the alternative for a new trial.

The Anzaldo family had checked into the Modern City Motel, owned by Croes, and were given a second story room which included an outside balcony. The balcony was entirely enclosed by iron grillwork with a gate leading to a fire escape stairway. The stairway which served the room as the only means of ingress and egress, was prefabricated, and attached to the building in such a way that it left a step eight inches in height at the top landing. This distance exceeded a comfortable step by ⅜ to ⅝ of an inch. The steps themselves were 24 inches wide. Both of these measurements were insufficient to meet the safety standards of the community. The balcony area and stair landing were encased in a mesh screen, except for the side of the landing toward which the gate opened. In addition to being open on the one side, the space between the individual bars of the railing was greater than the recommended ten inches, leaving an open space through which a child could easily fall. The gate on the balcony was below standards in that it was not self closing, and was too close to the stairs. At ground level and at the fire escape landing were concrete steps that led into a basement entrance. On the evening of August 13, 1969, Gia Anzaldo, then four years old, fell from the balcony, striking her head on one of the basement steps. The fall caused injuries to Gia, resulting in treatment at Creighton Memorial St. Joseph Hospital at Omaha, during which three electroencephalograms were taken.

In his motion for judgment notwithstanding the verdict, Appellant Croes asserts that the Appellee Anzaldo failed to

* Benson, Chief Judge, United States District Court, District of North Dakota, sitting by designation.

prove as a matter of law, that any negligence on the part of the defendant was a proximate cause of Appellee Anzaldo's injuries. We do not agree.

■ The evidence was sufficient for the jury to find appellant was negligent in maintaining a balcony and stairway that did not conform to the community standards of safety. In addition, there was evidence relating to the line of fall and point of impact, from which the jury could find the negligence was a substantial factor in causing the harm. Mulder v. Tague, 186 N.W.2d 884 (S.D.1971).

■ Appellant's motion for a new trial was grounded principally on the receipt in evidence of the EEG reports which were part of the hospital records of the Creighton Memorial St. Joseph Hospital of Omaha. The reports were summaries and conclusions of the doctors who read the actual tracings of the electroencephalograms, which were not a part of the record. The trial court had originally sustained the appellant's objection, and ruled these reports to be inadmissible as outside the scope of the Business Records Act. Later the court changed its ruling and allowed the reports into evidence without any testimony or cross-examination of the doctors. The tracings were taken at three different times under the direction of two different doctors.[1]

The report of each EEG bore notations as follows:

1. Dr. Harold A. Ladwig, August 21, 1969—"abnormal EEG, showing S3, right temporal area."

2. Dr. Harold A. Ladwig, May 19, 1970—"normal EEG."

3. Dr. Clifford Danneel, March 17, 1972—"moderately abnormal EEG for age."

The appellant attacks the admissibility of these reports unless the doctors are present and subject to cross-examination. Under a reasonable interpretation of both the Federal Shop Book Act, 28 U.S.C. § 1732, and the South Dakota Business Records as Evidence Act, SDCL 19–71–111, the appellant submits that the EEG reports are outside the scope of such acts, and opinions contained therein are not admissible as exceptions to the hearsay rule. Appellant argues that the Business Records exception exists because business entries covered by the Acts are trustworthy in that (1) they are a product of an efficient clerical system, (2) they are the kind of observations on which competent men would not differ, and (3) they are an automatic reflection of observation, citing New York Insurance Company v. Taylor, 79 U.S.App.D.C. 66, 147 F.2d 297 (1945) (en banc). As such, appellant argues that opinions and conclusions such as the EEG reports do not come within this exception as they are conclusions obtained from interpreting lines produced by electrical devices measuring the activity of the brain. Such interpretation, appellant continues, are by definition matters of judgment which depend on the training and skill of the individual interpreters; they are very subjective and subject to substantial disagreement among experts.

Appellee relies on the holding in Allen v. St. Louis Public Service Co., 365 Mo. 677, 285 S.W.2d 663 (1956), which followed the dissenting opinion in New York Life Insurance Co. v. Taylor.

"It would seem that the following parts of a duly authenticated and qualified hospital record should be admissible unless subject to specific objection such as irrelevancy, inadequate sources of information as being self-serving, as going beyond the bounds of legitimate expert opinion, or on similar substantive grounds: the physical examination findings, the patient's symptoms and complaints, treatment and progress records, diagnosis by those qualified to make them, the results of analyses and laboratory tests, X-rays, the behavior of the patient, and those parts of the patient's history inherently necessary (or at least helpful) to

1. The actual electroencephalograms were not offered in evidence.

the observation, diagnosis and treatment of the patient (citations omitted). The matters here noted do not purport to be exclusive. Since the hearsay objection is obviated, we see no reason why a proper expert medical opinion contained in a hospital record should not be accorded dignity equal to that of a similar opinion from the witness stand; to preserve the right of cross-examination intact as to such matters would be to repeal the statute." at 667.

Although the trend at present is narrowing the instances in which records kept pursuant to ordinary and routine business procedures are excluded if they include diagnosis or opinions,[2] the issue of admissibility per se remains open, and we do not decide it as a matter of law in this case.

After initially excluding the EEG reports, the trial court admitted them on the grounds that appellant's counsel had opened the matter on cross-examination of appellee's principal medical witness. Under the circumstances of this case, the trial court's initial ruling excluding the evidence was correct.

Appellant submits that because he was denied the opportunity to conduct meaningful discovery of the medical issues prior to trial, the court should have either excluded the evidence entirely, or granted a continuance to insure a fair trial. We agree.

■ An examination of the trial transcript shows that the matter was not opened by appellant's counsel in his cross-examination, but rather by information volunteered by the witness that went beyond the scope of counsel's question.[3]

In reversing its ruling at the trial and permitting the evidence to be received, the trial court should have granted appellant's motion for continuance to give the defendant an opportunity to cross-examine the doctors whose opinions were on the reports. The denial of a continuance, coupled with appellee's counsel's unwarranted pre-trial obstructionist tactics (explored more fully below), resulted in appellant's inability to secure meaningful discovery in the critical area of appellee's claim of mental and psychic damage.

Appellee, asserting physician-patient privilege, obtained a protective order from the court on April 17, 1972, preventing appellant from deposing Dr. John R. Mitchell, the primary treating physician, and Dr. Richard Altland, the psychologist. Just four days later, on April 21, in response to interrogatories requesting appellee to "[i]dentify each person that you expect to call as an expert witness at trial . . .", the appellee listed the same two doctors as "possible witnesses". They were called to testify at the trial with Dr. Mitchell as appellee's principal medical witness. The record is clear that appellee's counsel asserted medical privilege well knowing the witnesses appellant sought to depose were going to be used to testify on critical matters at the trial. Such tactics serve no purpose, except to obstruct and delay justice, and cannot be condoned.

One week prior to trial, the court held that appellee had waived medical privilege. It was too late for meaningful medical discovery. Appellant unsuccessfully tried to arrange for the depositions of Dr. Danneel and Dr. Mitchell.

Dr. Mitchell's testimony at the trial was based on the EEG reports. He had

---

2. See the advisory committee's notes setting forth the scope of the Proposed Rules of Evidence for United States Courts and Magistrates, Rule 803(6), 468 F.2d 1, 119, 120 (1973).

3. The following question was asked and the answer given at the close of the appellant-defendant's cross-examination of Dr. Mitchell:

"Q: So that other tests with regard to what you testified to since have been negative, that is, the angiogram and the neurologicals?
A: The two that you mention have been negative. *There have, been others.*"
(Emphasis ours)

not personally interpreted the electro-encephalograms, but was relying on the interpretation of Dr. Danneel and Dr. Ladwig, who were not produced at the trial, and thus unavailable to appellant for cross-examination. Appellant did not know prior to trial that Dr. Mitchell had not interpreted the electroencephalograms himself. These three EEG reports were offered to support a claim of injury which could expose appellant to the likelihood of a very substantial adverse verdict. This, together with the variance in the reports, made it crucial to the appellant to have the opportunity to explore and test the opinions of Dr. Danneel and Dr. Ladwig.

■ As previously stated by this court, a motion for continuance is subject to the broad discretion of the trial judge. Nutt v. Black Hills Stage Lines, Inc., 452 F.2d 480 (8th Cir. 1971); Greyhound Lines, Inc. v. Miller, 402 F. 2d 134 (8th Cir. 1968). And further, a trial court's refusal to grant a continuance cannot be overturned unless abuse of discretion or "prejudicial error" is shown. Nutt, at 483. Long ago we stated that "[t]his court cannot inquire into and examine the mental operations of the trial court in its exercise of a discretionary power. *On such an appeal as this we are limited to a consideration of whether the order itself constitutes an abuse of discretion in that it infringes the legal or equitable rights of the defendant as shown by the circumstances and facts conceded or undisputed."* Homeowners' Loan Corporation v. Huffman, 134 F.2d 314, 318 (8th Cir. 1943). The prime reason for resting broad discretion in the trial court as to continuances was clearly put forth by the Second Circuit, to-wit:

"The failure to be ready for trial when called—unfortunately, a condition too prevalent in our courts—is one of the basic causes creating a backlog of calendars. The ensuing delay caused by adjournments and other dilatory tactics, not only hobbles justice but causes the public to mistrust the entire judicial process." Davis v. United Fruit Company, 402 F.2d 328, 330 (2nd Cir. 1968).

However, that court was quick to add this caution:

"We realize that a court must not let its zeal for a tidy calendar overcome its duty to do justice . . . . In order to reduce this choking congestion, the district courts must be permitted to exercise their discretion in appropriate ways that will ensure justice to all who seek it . . . ." At 331.

In this case where counsel was unable to utilize discovery procedure designed to insure full knowledge of the facts and issues upon which adequate preparation could be based, we are unable to say that substantial justice was done. In light of the state of the record, it was a clear abuse of discretion to admit the reports, and not grant the appellant's motion for continuance.

It has been observed that prior to adoption of the present rules pertaining to discovery, results were not based upon the merits of the case, but upon legal maneuvering of counsel. Gebhard v. Niedzwiecki, 265 Minn. 471, 122 N.W.2d 110, 114 (1963).

The language of the Supreme Court highlighting the importance of discovery in this respect has been stressed in this circuit:

"The new rules, however, restrict the pleadings to the task of general notice giving and invest the deposition-discovery process with a vital role in the preparation for trial . . . . The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial.

. . . the deposition-discovery rules should be accorded a broad and liberal treatment. . . . Mutual knowledge of all relevant facts gathered by

both parties is essential to proper litigation. . . ." Hickman v. Taylor, 329 U.S. 495, 501, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) cited in Greyhound Bus Lines, Inc. v. Miller, 402 F.2d 134, 143 (8th Cir. 1968).

The instant case is similar to *Nutt,* which held that where the defendants did not learn of a claim for traumatic neurosis until commencement of trial, "[t]he court should have required the plaintiff to forego this new issue, . . . or, if plaintiff refused, then it should have granted the defendants a reasonable continuance." 452 F.2d at 483. This ruling prevailed despite (1) the fact that the record did not reveal any willful unfairness on the part of the plaintiff, or (2) that the appellant conducted "a vigorous and thorough examination" of the neuropsychiatrist who had examined plaintiff the day before trial. Chief Judge Matthes in dissent, pointed to the trial judge's attempt in *Nutt* to protect the appellant's interests by ordering a day's delay before allowing the neuropsychiatrist to testify, to enable appellants to have plaintiff examined by a physician of their choice. It would seem that the case for requiring a continuance to the appellant-defendant in this case is even more persuasive than the situation in *Nutt.* At any rate, in *Nutt,* this court concluded, in view of the purpose of the federal discovery rules, and that the neuropsychiatrist's testimony added a "significant new dimension" to appellee's case, that justice demanded such testimony be struck, or a continuance granted.

Without doubt, the admission of the three EEG reports added a "significant new dimension" to appellee's case, when considering that meaningful discovery had been denied.

The judgment is vacated and the case is remanded for a new trial limited to the sole issue of damages.