**NORTHSIDE MERCURY SALES & SERVICE, INC., Northside Lincoln–Mercury, Inc., Alton C. Ellingson and Steven E. Ellingson, Appellants,**

**v.**

**FORD MOTOR COMPANY, a corporation doing business in Minnesota, Appellee.**

**NORTHSIDE MERCURY SALES & SERVICE, INC., Northside Lincoln Mercury, Inc., Alton C. Ellingson and Steven E. Ellingson, Appellees,**

**v.**

**FORD MOTOR COMPANY, a corporation doing business in Minnesota, Appellant.**

**Nos. 88–5037, 88–5038.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 21, 1988.

Decided April 3, 1989.

James P. Larkin, Bloomington, Minn., for appellants.

Craig D. Diviney, Minneapolis, Minn., for appellee.

Before LAY, Chief Judge, McMILLIAN and WOLLMAN, Circuit Judges.

LAY, Chief Judge.

Northside Mercury (Northside), a Minneapolis auto dealership, challenges two evidentiary rulings in the six week jury trial of its numerous claims against Ford Motor Company (Ford) for constructive termination of its dealership agreement. Ford cross-appeals the submission of the tortious interference with contract claim to the jury. We affirm.

Northside commenced this action against Ford in October, 1984, alleging Ford had constructively terminated Northside's automobile dealership agreement. In November, 1985, Northside voluntarily sold its assets and leased its dealership facility to the operators of Brookdale Ford. Northside amended its complaint in April, 1987, to allege that Ford had tortiously interfered with Northside's lease arrangements with Brookdale Ford. After a six week jury trial, Northside's constructive termination claim went to the jury on three theories: violation of the Automobile Dealers' Franchise Act (ADFA), 15 U.S.C. § 1221 *et seq.;* breach of contract; and breach of an implied contractual duty of good faith. The jury found no violation of the ADFA and no breach of contract. The jury found that Ford did violate an implied duty of good faith, which resulted in a constructive termination, but further found that Northside had not suffered damages as result of this termination. The jury

awarded Northside $270,000 on the tortious interference claim, which the district court[1] remitted to $185,000.

## I. Evidentiary Rulings

■ The sole issue in Northside's appeal concerns two evidentiary rulings made by the district court during the course of this six week trial. Northside alleges the district court erred when it refused to admit certain evidence contained in financial statements of two other Minneapolis Lincoln–Mercury dealerships. Northside claims this evidence would show that its sales performance was comparable to these other regional dealerships. The district court did admit these financial statements; however, they were in redacted form. Its basis for excluding the complete forms was Federal Rule of Evidence 403. Specifically, the district court found that the probative value of the proposed evidence to the issue of damages was substantially outweighed by the danger of confusion of the issues to the jury and considerations of undue delay. After review of the record we cannot say that this exclusion under Rule 403 was a clear and prejudicial abuse of discretion. *See Hicks v. Mickelson,* 835 F.2d 721, 726 (8th Cir.1987).

■ The second evidentiary ruling challenged by Northside concerns the exclusion of alternative damage calculation testimony by one of its experts, Dr. Ostlund. These alternative calculations were prepared the evening before they were offered at trial and their existence was not disclosed to counsel for Ford until the morning they were offered. The district court refused to allow Dr. Ostlund to testify in this regard finding that this additional, alternative testimony would result in undue delay and unfair prejudice and surprise to Ford. Northside relies on this court's case of *Nutt v. Black Hills Stage Lines, Inc.,* 452 F.2d 480 (8th Cir.1971), and argues that the proper course for the district court to have taken with regard to Dr. Ostlund's testimony would have been to allow it into

evidence and then allow Ford, if necessary, a continuance to prepare for cross-examination. We disagree. The district court has broad discretion in this area. This court will not second guess a trial judge's decision to exclude evidence rather than incur a further continuance of an already lengthy trial. The judgment of the district court is affirmed.

## II. Tortious Interference Claim

■ Ford cross-appeals claiming it was error for the district court to deny its motion for judgment notwithstanding the verdict on the tortious interference claim.

The standard for granting a judgment n.o.v. is well-established. Both the trial court and this court must: (a) consider the evidence in the light most favorable to the prevailing party, (b) assume that the jury resolved all conflicts of evidence in favor of that party, (c) assume as true all facts which that party's evidence tended to prove, (d) give that party the benefit of all favorable inferences which may reasonably be drawn from proved facts, and (e) deny the motion if in light of the above reasonable jurors could differ as to the conclusions that could be drawn from the evidence. *McGee v. South Pemiscot School Dist. R–V,* 712 F.2d 339, 343 (8th Cir.1983); *Hanson v. Ford Motor Co.,* 278 F.2d 586, 596 (8th Cir.1960). In applying this test to the present facts, we hold that the district court was correct in finding that sufficient evidence existed in the record to preclude granting judgment n.o.v.

We, of course, apply Minnesota law. Minnesota cases have adopted the Restatement (Second) of Torts § 766B (1979). *See United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628 (Minn.1982); *North Central Co. v. Phelps Aero, Inc.,* 272 Minn. 413, 139 N.W.2d 258 (1965). The elements of the cause of action of tortious interference with a prospective contractual relation are set out in § 766B:

---

**1.** The Honorable Donald D. Alsop, Chief Judge, United States District Court for the District of    Minnesota.

## § 766B. Intentional Interference with Prospective Contractual Relation

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

Ford urges that the two crucial elements of § 766B, i.e., intent and whether the interference was justified, were not proven. The factors to be considered when making such a determination are found at § 767 of the Restatement (Second) of Torts (1979):

### § 767. Factors in Determining Whether Interference is Improper

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

The evidentiary record shows that in the summer of 1985 Northside began negotiating with the operators of Brookdale Ford (Brookdale) for the sale of Northside's assets. Lawrence Parkhurst handled these negotiations for Brookdale. On August 13, 1985, Northside and Brookdale signed a purchase agreement which called for Brookdale to buy Northside's assets and to lease the existing dealership property from Northside for five years at a rent of $15,-000 per month. This agreement expressly provided that if Ford did not approve the transaction by August 30, 1985, it would expire by its own terms. Northside immediately forwarded this agreement to Ford for its approval. Ford did not approve the transaction before August 30. Northside and Brookdale did eventually negotiate an amended agreement which was ultimately approved by Ford. The amended agreement, although retaining the original purchase price, called for only a two-year lease term instead of five years as in the original agreement.

In support of its motion for judgment n.o.v., Ford argues that: (1) the evidence was insufficient to show it had interfered with the Northside–Brookdale lease arrangement; (2) the evidence was also insufficient to show it had acted intentionally; and (3) its conduct was justified. Ford argues that 17 days was an unreasonably short time period for Northside to expect approval and it is only because of Northside's own insertion of this clause in the agreement that it expired. Ford therefore argues that it did not disapprove the agreement; rather it merely expired by its own terms.

Northside contends, and the district court agreed, that sufficient evidence existed to submit this claim to the jury. Northside presented evidence that Ford was in contact with Brookdale, via Mr. Parkhurst, during early August while the original lease arrangements were being negotiated. Northside urges that Ford was instrumental in Brookdale's change of heart as to the length of the lease term. Additionally, Northside presented evidence that it was because of Ford's own earlier requirements that the August 30 expiration date was inserted. For example, Ford's branch manager, David Stepek, wrote a letter on May 30, 1985, notifying Northside that if it did not acquire additional space for car displays and storage before August 30, 1985, Stepek would recommend termination of this dealership. Likewise, in June of 1985, Northside had entered into a similar agreement to sell its dealership to Walser Corporation (Walser). On July 11, 1985, Northside met with Ford representatives to discuss the terms of the sale to Walser. On July 15, 1985, Stepek advised Northside

that Ford would be able to process and approve the Walser transaction within a week to ten days. Northside argues that 17 days was therefore not an unreasonable time period in which to expect approval from Ford in the Brookdale transaction. Finally, Northside presented evidence that in the earlier proposed Walser transaction, it had worked with Ford representatives in drafting the required "letter of resignation." When Northside sought Ford's approval of the Brookdale buy-lease arrangement on August 13, it submitted a letter based on the resignation letter which had been suggested and accepted by Ford in the earlier Walser transaction. However, on August 22, 1985, Stepek wrote Northside indicating that the procedure Ford had recommended two months earlier in the Walser transaction was not acceptable in the Brookdale transaction. Northside argues that Ford could offer no explanation at trial for the imposition of this different procedure. Ford, in response, argues that the circumstances of the Brookdale transaction were different and because different parties were involved the earlier resignation letter needed modification.

Ford further argues that Northside failed to prove any intentional act or conduct on its part. In this regard, Northside relies on Restatement (Second) of Torts § 766 comment h (1979), which states in part:

> *h. Inducing or otherwise causing.* The word "inducing" refers to the * * * case when performance by B [Northside] of his contract with C [Brookdale] necessarily depends upon the prior performance by A [Ford] of his contract with B [Northside] and A [Ford] fails to perform in order to disable B [Northside] from performing for C [Brookdale]. The rule stated in this Section applies to any intentional causation whether by inducement or otherwise. The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

Whether or not Ford's actions rose to the level of interference, were intentional, or were justified turns upon issues of fact and inferences from the evidence presented. Indeed, since both sides presented viable, conflicting evidence the credibility of the witnesses was also put in issue. Again, the Restatement is instructive:

> *l. Function of court and jury.* The jury determines whether the defendant's interference with the plaintiff's advantageous relation was intentional or not. * * * The analogy to negligence [cases] continues to hold in the situations where no recognized privilege has been formulated. Here, as with negligence, when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the matter in which they would operate upon the facts in question.

Restatement (Second) of Torts § 767 comment *l* (1979).

The district court's denial of Ford's judgment n.o.v. was proper. Because of the cross-appeal, each party shall pay its own costs. The judgment of the district court is AFFIRMED.